We will give you one minute and rebuttal in the periods of your time. Thank you and we are ready to begin. So we can begin with Rajwayi v. Rosen. No longer Rosen, but I'm not sure. We haven't changed it. And Ms. Cifuentes can begin. May it please the court. My name is Rachel Cifuentes, pro bono counsel for petitioner Beatrice Rajwayi. I would like to reserve two minutes for rebuttal. This case comes down to credibility. This whole appeal turns on whether Dr. Wild's medical opinion is material to the immigration judge's adverse credibility determination and whether the board erred in finding that it was not. Dr. Wild's opinion is vital and material to the credibility finding because that doctor found that when Ms. Rajwayi is inconsistent at court hearings, she is not malingering. She is not attempting to deliberately mislead. Rather, she is suffering from an extremely disturbed mental state. Her experiences at her hearings for asylum trigger her. Her thoughts are blocked, her memory confused and non-sequential. The board's determination that that undisputed medical evidence was immaterial to her claim and immaterial to the credibility finding is the very definition of arbitrary, irrational and contrary to law. As a result, this court should reverse with instructions to reopen and remand. Counsel, I have a question about this. Whether at a hearing or not, in any other context, has your client come forward with an explanation for how there could be this discrepancy between the newspaper missing person ad? Yes, your honor. Ms. Rajwayi has come forward with evidence in her motion to reopen, the second motion to reopen, and the reply brief regarding the newspaper article. As your honor knows, she testified that she downloaded the article from the internet and the government showed that that could not have happened because the article was forged. So she submitted an affidavit from the sister of her rapist, saying that the sister sent Rajwayi the article to show that danger still awaits her in Kenya. She also submits the medical opinion from Dr. Wild, which tells us- Counsel, counsel, you're going- I think you're missing my question. You started to get to it there, but if you could just back up so that I can maybe get you to really respond. I'm trying to figure out- this is the discrepancy. She testified that she herself went in and downloaded this article, as I understand it. So how did- I don't know how any of the other evidence changes this problem that she's got. It's not that somebody sent it to her and that she's- I understand the record. The record is not that somebody sent it to her and that she then, for that reason, didn't realize that there had been this apparent alteration of the document. My understanding from her testimony is that she went in and downloaded it from the newspaper. What am I missing there, please? So that is a misstatement by her. She did not download the article from the internet. She couldn't have. But that is what she testified to in the court. And that's why the medical opinion evidence from Dr. Wild is a reason why the credibility determination could change. Because Dr. Wild's opinion shows that when Ms. Rushwahi is tested in a court of law to testify about events related to the hearing, to the asylum, to her rape, her memory is confused. Her thoughts are blocked. Oh, I'm sorry. The problem is that her testimony about the newspaper didn't seem confused or incoherent, nor was it short. Nor was it triggered by cross-examination. It was her affirmative testimony. And it was lengthy and specific. So it's hard to connect whatever mental health issues she might have had at that time with that testimony. The doctor explains to us, Dr. Wild, that Ms. Rushwahi is in a continual state of overload. And it's especially triggered by the events of the hearing. So her long-term memory is confused and non-sequential. Her thoughts, her condition that is equivalent to extreme trauma, brain damage, the typical kind of activity that the doctor normally sees only in very young children or people with a psychosis. It's a continual condition that she's experiencing. It's especially bad on a cross-examination type situation. That's my point. This wasn't a cross-examination type situation. My understanding is that she said this affirmatively and at length and linearly and coherently. Is that right? That's right, Your Honor. But the opinion should be used as a lens to view her overall life. This is a condition which she suffers from all the time. And she's in the condition where she is experiencing a fear of having to be returned to Kenya if her testimony is not believed. And the doctor explains that when she is in these situations, she has a panic attack. And as Your Honor points out, it's worse when it's a cross-examination situation. But it is always present. It is always affecting her mind. Ms. Cifuentes, that would mean that no matter what your client said or did during a hearing, and there's more than one inconsistency. I guess it would be fair to describe it as egregious inconsistency with respect to the newspaper article, which, as Judge Berzon noted, she testified to multiple pages in the transcript quite coherently and clearly about. It did not change that story until she was confronted with the evidence that it was not plausible. But wasn't challenged on it when she said all of that. She also talked about a postcard that she received that was dated after the time she said her husband disappeared, or she lost contract with him. And there was also questionable testimony about signatures on her wedding license or wedding certificate. But through all of this, the immigration judge found that she was coherent, clear, calm. So much so that the immigration judge was willing to overlook some inconsistencies and believe her and find her credible initially. So what you're suggesting then is anything she says, no matter what it is, because of Dr. Wild's opinion, that doesn't mean that the agency can find she's not credible. The agency has to accept or disregard any inconsistencies because of her diagnosis. I don't see any way around it. I mean, what else are they supposed to do with this woman? She comes in and testifies coherently and clearly. Well, Your Honor, what they can do is use the procedures that the board and the processes that the board has in place for people who are suffering from a mental incompetency type situation. So you want them to invoke the procedures of NREA MAM. And you didn't exhaust that. You didn't claim she was incompetent or exhaust that argument below. But I understand your position is that it's exhausted because it's part of your argument that it could have made a difference. Is that correct? Yes, Your Honor, exactly. And the reason that the process wasn't requested originally is because the medical opinion occurred after the hearing process. It was seven days before her motion was submitted. It's new evidence. It's a new grounds for applying those types of procedures. So your medical evidence, Dr. Wild, can't establish whether the petitioner is credible, right? I mean, she's not in a position to say that. That's the determination for the agency, for the immigration judge. So the evidence would just be that there's this diagnosis and that she has these sorts of issues. And then the immigration judge is going to have to weigh the credibility of the petitioner when she testifies. If we were to remand and have another hearing, that is what's going to happen again, right? Yes, Your Honor, that is the process which should occur. Okay. And the BIA found that it wasn't material because given the immigration judge's description of how articulate, clear, calm, coherent she was, it's not going to make a difference. And you're saying that that's not supported by substantial evidence. Yes, Your Honor, that's correct. That is our position. The medical opinion should be used as a lens for viewing her entire testimony. Which gets me back to my first problem. That means that we can never not find her credible. It's not that she can never be found credible. It's that there's specific information in the opinion that is relevant to the credibility finding about her distorted memory and her amnesia. And the fact that it is especially relevant to her trauma and her fear of being returned to Kenya. The reason why it doesn't seem to connect up is that she didn't say, I don't remember, I don't know how I got it. She was very specific at great length. And similarly, she wasn't confused or tentative. Not at all. The IJ's finding was that she was, quote, extremely detailed and consistent. There wasn't hesitation. That's the problem. There wasn't hesitation. There wasn't concern about her seeming to try to remember something she was having difficulty remembering. That's what my colleague, all three of us now, are inviting you to respond to that point. And so far I haven't heard a response. Is there anything? Yes, Your Honor. I see my time is up. But to answer the question, what the doctor does say is that she's suffering from a panic attack triggered by the situation. And in a panic attack situation, a person could say whatever they need to say to get out of that situation. Okay. That's the part we do understand. And just to be clear, and then we'll move over because you're out of time. Your position now is that the situation you're talking about is the situation of testifying. Is that it? Yes, testifying and specifically about testifying to her trauma. Thank you. The forced marriage. Thank you. Got it. Thank you. Mr. Tennyson. You're muted, sir. Or at least I can't hear you. Let's see if I can do this. Okay. Good afternoon. Robert Tennyson for the government. Thank you. I forget these things all the time. Very briefly, the board did not abuse its discretion in denying a motion to reopen here. As petitioner's counsel has argued, it seems that any kind of the PTSD diagnosis in this case is essentially a free pass. Any inconsistency, not just inconsistency in testimony, which there wasn't as the immigration judge found, but inconsistency or lack of coherence between the testimony and documents, which the immigration judge found in great deal, is excused. Well, and the other problem I've had, which is at the top of the argument, even now, even now I'm looking for understanding that perhaps there was a crediting all of that. Right. So there's perhaps a panic attack during the testimony. Even now, after the fact, I'm looking for an explanation for how can this be? This downloaded article that very clearly I don't want to go through the facts because you know them very clearly. Someone cut and pasted this provision. So I'm still looking for a coherent argument and I don't see it. I guess we would have to infer that she didn't download it, that someone else did this and sent it to her. But we really don't have any evidence indicating that. Right. I mean, subsequently, she offers an affidavit that says, oh, my sister in law in Kenya sent me, you know, sent me an email about the article. And then along with this motion to reopen, we have an affidavit from that sister in law who, again, said who states, oh, I found me. Your abuser gave me a copy of this article and I sent it to you. Right. Right. But we still would have to have a plausible reason to understand why would an abuser do that? Still, I cannot connect these dots. Right. Your Honor, I can't do it either. And I think that the board and if you can't connect the dots and I can't connect the dots, it certainly wasn't arbitrary, capricious and contrary to the law for the for the board to have not been able to connect the dots. That's my question. This is a motion. And I think that seems extremely unlikely that anybody is going to believe. But there is or that the psychologist has much bearing on that particular problem. But this is a motion to reopen. She filed a declaration. She's not supporting information. I think the board is supposed to take that as a motion to reopen and then reopen. And then you can find that it isn't true. Right. So, right. For reopening purposes, we take her her report as being true unless there is some reason to think that, you know, it's completely incredible. Right. And that it's obviously and facially so. But even if that's the case law that says that we have to adopt that we take is true. The evidence that's been presented with the it's been presented with a motion to reopen. Right. And there's there is there is an exception. And I don't know. I think it's probably in cases, not cases like multi. I believe that that's that that might have come up in there, but I'm not entirely certain. But it seems to be a fairly common principle that there's a very narrow exception. We're not arguing that exception here. We're saying let's take it as true. Let's take it as it says, as it is on its face. Right. But as it's true, I think that would be just to fill in the blanks. Right. That she's had a panic attack. She had a panic attack when she had to deliver this testimony. OK. Right. And then I guess falsely, just incorrectly, we'd say testified that she maybe maybe misremembered that she testified that she downloaded this. And I guess we'd have to take as true that what really happened is that was wrong and that this relative sent it to her. OK. But I'm still trying to figure out why the accuser would have created this document. That's where I get. That's how I get that. I feel like I'm getting there by giving her that benefit of a doubt out of motion to reopen stage. That's my invitation for both of you to address. Right. OK. So we give her the benefit. We give the the the statement the benefit of the doubt. I think that the statement actually says less than that. That really what it talks about is that focuses on that her internal inconsistency and the discussion of short term memory problems and sequential thinking and organizing her memory. I suppose that the panic attacks, as you've discussed, are another issue. But she is testifying before she is confronted with the documents and the inconsistency. And she says, oh, three people in Kenya called me. They let me know. They told me that this document exists.  And then I went and that this that this missing person's notice was in the Daily Notion. Right. Physically there. And that I then went online to a Kenyan nation website and downloaded that particular article, printed it out, became part of the record. And then she's confronted with all the problems with it. Without invoking the caveat about non-credible evidence, you could not reopen if you credit what she said. And what she said is what I said. That's not what happened. What actually happened is this. And let's leave the psychiatric testimony out of it. I mean, she's asked some attempt at an explanation of why that would be. But she's saying now that what she said that is true and what is true is this. And so how does it fit into the motion to reopen rubric? Unless you say, well, look, you just can't say the opposite of what you said before in a way that nobody is likely to believe. So there's no point. I don't see how you're crediting what she said. Right. Right. I think I think there's something about it. And there's an older case called Tofigi that this court issued that that involved in. Let's see. I believe an accurate credibility finding. And then the petitioner came back later and said, oh, but there are these changed country conditions. And the court then responded. But it doesn't matter. You weren't credible the first time around. I think that this potentially falls into that same ball of wax. I mean, in the same sense that, look, the credibility determination stands. It's I mean, the adverse credibility determination stands. We can't get away from it. And we have this other document that we have to accept is true. But ultimately, to the extent that she is attempting to testify differently today than she testified before. I think that that if we are going to say that there is an exception to sort of this general prescription that you can't look behind the veracity of the documents that come with a motion to reopen. This is going to be the circumstance in which that's true. But putting all that aside. The difficulty we continue to have is that in and responding to Judge Christians question. Her original story is that the reason why that missing persons notice is in the paper is because. Her persecutor is trying to find her in Africa and figure out where she is or trying to find her in Kenya and figure out where she specifically is. But what the newly offered evidence does is it shifts the story entirely and the explanation of what he's attempting to do. It's no longer he's trying that that really the individual who's trying to find her is attempting to find her in Africa after she's left. It's now he's getting this. He's printed this out and given it to people at this false document to people who know her and know where she is in order to intimidate and terrorize her. There's a totally different explanation for that document that comes behind it. And so if we are talking about the materiality of the two, if we are talking about whether one changes the other, whether we're talking about whether the the PTSD has an effect or the coherence of her testimony has an effect on this ultimate coherence of the documents that she's offered. The board was not arbitrary. It wasn't acting capriciously. It was not acting in contravention of law in saying that there one is not material to the other. If this court doesn't have any other questions for me, the government will rest. Thank you. I do have a question. OK, I do have a question on a different matter. The BIA found that that the motion to reopen was untimely and number barred and that equitable tolling didn't apply. And you're not defend that that reasoning. So my question is, are we precluded from considering or reviewing the BIA's decision on equitable tolling given the government's failure to defend that reasoning? We don't. The government doesn't think that you act, that you need to get in to address that. The materiality determination is dispositive, but the court does. The government hasn't taken it as way taking a position on that argument. We would prefer that it goes back to the board to give them the opportunity to address it in the first instance. But again, that that is entirely up to the board to address it already. Why would we send it back to them again? I have seen this happening very, very recently. The government asks essentially that on an issue that they don't want to defend in the current BIA record or decision. They ask us to remand it to the board to have them do it over again. Why should we let them do it over again? I mean, I don't know that we reach it either when you haven't defended it. But if we were to reach it, why would we let them do it over again? Your Honor, it. It's always worthwhile to get the boards, I guess, what reasoning and clear reasoning on it. But you're right. This would be a third bite of the apple by the board. I don't think we have this is entire. If the court doesn't want to remand it, we would prefer it gets remanded. I'm not going to stand up here and say, you know, you must remand it. We have waived argument on the issue and we think that the materiality of question is dispositive. So I leave it to the court. It was time in two or three counties where you had this, where the government says, we're not going to defend this issue. And if you think that it matters, you should remand. So there's some pattern going on. Like you can tell people the next time that this is suggested that somebody tell us why the board gets to do things over. Or why we should let them do things over again. I mean, I understand there's a change in the case law or something that they should have looked at. And they didn't, but they addressed it. And I don't know why we have to do it over again. So it's not really a question for you. It's more a message to whoever it's a fairly new and very repetitive pattern. And I haven't had an explanation as to why it makes sense. I understand the concern, Judge Berzon. I don't have any real response. I guess it's up to this court and really ultimately up to the board to figure out how it wants to respond to its remands. If the court has no other questions for me, I will rest. Thank you so much. We have about a minute. We have a little less than that, but go ahead. You're muted. Sorry. Can you hear me now? Yes. To address the question that was raised about the article and how is it plausible that the rapist would create the article and have it sent via his sister to Ms. Rajwahi. The evidence in the record is that he is her rapist. He doesn't see her as a person. He sees her as property to be inherited. That's consistent with the practice in Kenya of wife inheritance that he kidnapped her children. When she went to save them, raped her, tortured her, held her against her will. This is a man who the record shows does not respect her as a human being. And so taking the extra step of giving her another little torture through an article sent via his sister is believable. It's consistent with the type of person who would do this to a presumed widow. And as the court pointed out, the affidavit from the sister should be taken as true. And the sister explains that the brother gave her the article. She sent it to Ms. Rajwahi to make her aware of the dangers in Kenya. And the medical opinion supports that Ms. Rajwahi had a panic attack, a confused memory, unable to discuss. I don't understand how it makes her aware of the dangers in Kenya. Did she tell her that it was a false article when she sent it to her? No, the affidavit states that the sister thought it was real. And also Ms. Rajwahi thought it was real. The article was fake, but the fear was real. Okay, your time is up. And thank you very much for a very compassionate argument, both of you. And we will submit the case of Rajwahi v. Rosen and go to the next case of the day, which is Gonzales Rodriguez v. Rosen.
judges: Berzon, Christen, Bade